AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>One Thinkpad laptop computer,<br>Type 20NX-000MUS,<br>Serial No. PF-1RF3MJ 19/06 | )<br>)<br>)<br>)<br>)<br>)   Case No.   '22 MJ03720 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. 78j(b), 78ff; 17 | Securities fraud |
| C.F.R. 240.10b-5; 18 U.S.C. | Mail and wire fraud |
| 1341, 1343; 1956, 1957 | Money laundering |

The application is based on these facts:

See Affidavit of Special Agent Alexander E. Murray, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*Alexander E. Murray*_____
*Applicant's  signature*

Alexander E. Murray, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:    _____10/14/2022_____

_____*Barbara L Major*_____
*Judge's signature*

City and state:  San Diego, California

Honorable Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A-1**

**Property To Be Searched**

The property to be searched is one Thinkpad laptop computer, Type 20NX-000MUS, Serial No. PF-1RF3MJ 19/06 (the "**Target Computer**"), which currently is in the possession of the Federal Bureau of Investigation, San Diego Field Office, 10385 Vista Sorrento Parkway, San Diego, California 92121. Photographs of the **Target Computer** are below:





## ATTACHMENT B-1

### Items To Be Seized

Authorization to search the device (the **Target Computer**) described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the device for evidence described below. The seizure and search of the device shall follow the search methodology described in the "Procedures for Electronically Stored Information – A. Target Computer" section of the affidavit submitted in support of the warrant.

The evidence to be seized from the device will be electronic records, communications, and data such as electronic documents, mail, agreements, contracts, account or other statements, bank records, records of financial transactions, messages, images, photographs, videos, audio files, recordings, histories, address books, ledgers, lists, notes, and location data, for the period from **July 1, 2018, up to and including September 30, 2022**:

1.  tending to indicate efforts to solicit investments in, loans to, or other payments to JMJ Capital Group ("JMJ") or other companies or business ventures, or to communicate with, pay back, or withhold payments from investors, or efforts to invest, allocate, transfer, or otherwise spend money obtained from investors;

2.  tending to indicate JMJ's business activities or investments;

3.  tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, or phone numbers—that may contain electronic evidence tending to show efforts to solicit investments in, loans to, or other payments to JMJ or other companies or business ventures, or to communicate with, pay back, or withhold payments from investors, or efforts to invest, allocate, transfer, or otherwise spend money obtained from investors;

4.  tending to identify co-conspirators, criminal associates, or others involved in the crimes listed above;

5.  tending to identify prospective or actual investors in JMJ or other companies or business ventures;

6.      containing personally identifying information of third parties, including social security numbers, ages, dates of birth, addresses, telephone numbers, credit and debit card information, and bank or other financial institution information;

7.      tending to identify travel to or presence at locations involved in the fraudulent scheme and crimes listed below, including locations involved in soliciting investments in, loans to, or other payments to JMJ or other companies or business ventures, or communicating with, paying back, or withholding payments from investors, or investing, allocating, transferring, or otherwise spending money obtained from investors;

8.      containing information related to financial statements, records of income, domestic and international transfers of money, wire transfers, cash deposits, and money transfer agents such as Western Union or MoneyGram;

9.      tending to identify the user(s) of, or person(s) with control over or access to, the **Target Computer**; and/or

10.     tending to place in context, identify the creator(s) or recipient(s) of, or establish the time of creation or receipt of communications, records, or data above;

which are evidence of violations of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 1341, 1343, 1956, and 1957.

### AFFIDAVIT IN SUPPORT OF
### <u>APPLICATION FOR SEARCH WARRANTS</u>

I, Alexander E. Murray, being duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION</u>

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 3, 1996. I am assigned to the FBI San Diego Field Office, North County Resident Agency. Before becoming a Special Agent, I received a Bachelor's degree in Sociology from the University of Virginia in 1987. I also served for nearly seven years as a Warrant Officer in the U.S. Army. While working as a Special Agent, I have attended many types of training courses, beginning with a 16-week FBI new agents' class, during which I received instruction on various aspects of federal investigations. I have also received specialized training related to internet facilitated fraud, white-collar crimes, and other types of criminal violations.

2.      In the more than twenty-five years that I have been a Special Agent, I have become experienced in investigations involving all types of economic crimes, including the methods and means employed by individuals who engage in these offenses. I have investigated numerous criminal offenses including wire fraud, mail fraud, and money laundering. I have also been involved in the execution of numerous federal search warrants. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI, other federal agents and officers, and regulators who have expertise in investigations involving economic crimes.

3.      I make this affidavit in support of applications for warrants to search:

(1)      One Thinkpad laptop computer, Type 20NX-000MUS, Serial No. PF-1RF3MJ 19/06 (the "**Target Computer**");

(2)      One black iPhone with black case ("**Target Phone 1**"); and

(3)      One silver iPhone with black case ("**Target Phone 2**", together, the "**Target Phones**"),

as set forth more fully in Attachments A-1, A-2, and A-3, attached hereto and incorporated by reference herein; and to seize evidence of violations of federal criminal law, namely, Title 15, United States Code, Sections 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, (securities fraud), and Title

18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1956 and 1957 (money laundering), as set forth more fully in Attachments B-1, B-2, and B-3, attached hereto and incorporated by reference herein.

4. The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of victims; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. All dates, times, and amounts are approximate. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## STATEMENT OF PROBABLE CAUSE

### A. Overview of Fraudulent Scheme

5. The FBI has identified at least approximately 50 investors who invested funds with RAMIREZ and his business, JMJ Capital Group (JMJ), between 2018 and 2022. RAMIREZ founded, managed, and has controlled JMJ, which is a California-registered entity. Investigation and analysis of bank records has shown that these individuals invested with JMJ over $8 million in total. I believe, based on evidence collected through this investigation, that RAMIREZ secured these investments through a fraudulent scheme involving misrepresentations about his company and potential returns, as discussed in greater detail below. He gave back just over $3 million to investors, creating a net investment—a loss to investors—of over $5 million.

6. RAMIREZ's activities relating to his scheme have taken place primarily within the Southern District of California, including at golf resorts, and elsewhere, including the Eastern District of California and the District of Arizona, as investigation has shown. and earlier on—in 2018—in or around Fresno, in the Eastern District of California. Many of RAMIREZ's investors live within the Southern District of California, and I believe RAMIREZ has resided and conducted his fraud within this District.

7. The FBI has interviewed 10 people who invested with RAMIREZ and JMJ between 2018 and 2021. The FBI also has received and analyzed many bank records related to RAMIREZ and JMJ through subpoenas. Further, several investors have provided the FBI with documents relating to their investments, including emails, text messages, checks, and documents that were purported by RAMIREZ to be account statements or funding agreements. The investigation is ongoing.

8. Based on the interviews of investors thus far and other information from the investigation, RAMIREZ falsely and variously claimed to investors that JMJ purchased and resold personal protective equipment, factored accounts receivable, sold furniture to home-improvement retail companies, invested in check-cashing services, invested in a patio furniture company, and contracted with a cruise line to rebuild and refurbish air conditioning units on its ships (collectively, the "Business Opportunities"). RAMIREZ falsely promised investors returns on investment ("ROI") of approximately 10% to 14% in 90 days and 20% to 30% in one month, which returns were generated by the Business Opportunities. He also falsely claimed that investors that they could withdraw their money at any time.

9. RAMIREZ's scheme to obtain investments in JMJ was successful. He received from investors at least approximately $8 million and caused investors to lose at least approximately $5 million. He used investors' funds in a deceptive and misleading manner: instead of to support and advance JMJ's Business Opportunities, RAMIREZ used their money to pay for personal expenses, including luxury vehicles, travel, potential real estate transactions, and other expenses, and to make Ponzi-style payments to other investors to perpetuate his fraudulent scheme.

10. Based on the FBI's analysis of bank records, the first confirmed investment in JMJ through RAMIREZ's scheme occurred on or about September 10, 2018. RAMIREZ opened a personal Wells Fargo account in January 2018, the first JMJ account in September 2018, and received the first large deposit (totaling $500,000) into that JMJ account the same month, in September 2018. Based on the facts set forth herein, along with my knowledge of the investigation and training and experience, I request warrants to search the **Target Computer** and **Target Phones**

for evidence of RAMIREZ's crimes for the time period of **July 1, 2018, up to and including September 30, 2022**.

11.     On September 30, 2022, a federal grand jury in this District indicted RAMIREZ, charging him with one count of securities fraud, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; two counts of money laundering, in violation of Title 18, United States Code, Section 1957; and criminal forfeiture allegations.

12.     RAMIREZ was arrested in the late afternoon on September 30, 2022. Agents arrested him as he arrived at Lenders Recovery Service, a repossession business located near Mira Mesa in San Diego, California ("LRS"). In September 2021, RAMIREZ purchased a new, 2021 Cadillac Escalade (the "Escalade") in Santa Clara, California, for $131,470.78, as records show. He paid $50,000 by cashier's check—fraudulently, through check kiting. His own account became overdrawn, and he deposited two checks into it which were drawn on a Chase account of Alexandria Counihan ("Counihan"), his fiancée or significant other, which subsequently bounced. RAMIREZ borrowed the remainder of the Escalade's cost from Ally Financial, as records also show. In 2022, he became behind on payments for this vehicle, and in locating RAMIREZ to arrest him, agents learned that the vehicle had been repossessed by LRS on or about September 28, 2022. Through further investigation, agents determined RAMIREZ was meeting with LRS representatives again on September 30, 2022, apparently to make a payment on the car and get it out of repossession. He was arrested as he arrived for that appointment at LRS.

13.     Since RAMIREZ's arrest, several individuals have contacted the government about their own or others' investments in RAMIREZ's businesses, including JMJ. At least two such individuals have spoken with agents about very recent investments they made with RAMIREZ, which related to different and additional misrepresentations by RAMIREZ. For instance, one investor stated that she invested with RAMIREZ in September 2022 based on business opportunities relating to security systems. Further, as noted below, Counihan told agents that RAMIREZ recently has begun running a new company, "Sunwest", and purportedly has employed

4

several people including one of her family members. She also told agents that none of these supposed "employees" have been paid so far.

14.     Accordingly, based on my knowledge of the investigation and RAMIREZ's fraud, and my training and experience, I believe RAMIREZ's scheme extends beyond JMJ and likely includes fraud, money laundering, and possibly other violations of federal law relating to additional and recent business and investment opportunities he has promoted. Investigation remains ongoing.

**B.     Target Computer**

15.     The Escalade was at LRS for a short period after RAMIREZ's arrest and then was towed to a different location. Before it was towed, LRS employees removed all items and personal property from the Escalade on or about September 29, 2022, and kept them in secure storage at LRS. LRS advised agents that LRS removed the **Target Computer**, among other things, from the Escalade and placed the computer within the secure manager's office at LRS.

16.     On October 4, 2022, the Honorable Daniel E. Butcher found probable cause and approved a warrant to search the premises of LRS and to seize the **Target Computer**. On October 5, 2022, agents seized the **Target Computer** from LRS. As stated in the supporting affidavit for that warrant, that warrant was for the seizure of the **Target Computer** but not, at that time, for a search of it. I submit this affidavit and request this warrant so that agents may search the **Target Computer** for evidence of RAMIREZ's crimes, as set forth in Attachments A-1 and B-1.

17.     After his arrest, RAMIREZ was advised of and waived his *Miranda* rights. In summary, he told agents he had obtained approximately $600,000 from investors in connection with JMJ and thought he owed them approximately $1 million, but claimed he would be repaying all of them through a new PPE-related deal he was working on. He claimed he was brokering a PPE transaction involving shipments from Asia worth $13 billion which was scheduled to close on October 3, 2022, and he would be making approximately $25 million from this deal. Based on his statements, the facts set forth above, my training and experience, and my and other agents' knowledge of this investigation, I believe RAMIREZ was referring to a fictitious investment or business opportunity during his post-arrest statement, and he was continuing his fraudulent activities and misleading investment claims up to the time of his arrest.

18.     During his post-arrest statement, RAMIREZ did not mention to agents a laptop or other computer he used in connection with JMJ and the investments he solicited.

19.     After RAMIREZ was arrested, agents have conducted consensual, non-custodial interviews of Counihan. She was interviewed in person on September 30, 2022, at the Carlsbad-area hotel at which she and RAMIREZ had been staying recently, and by telephone on October 3, 2022. In summary, as relevant to the **Target Computer**, Counihan told agents RAMIREZ had two phones, which were with him at the time of arrest—the **Target Phones**—and a Thinkpad laptop computer (the **Target Computer**), which was in the Escalade. Counihan said this laptop was RAMIREZ's and that she had used to teach him how to use Docusign. Counihan also disclosed the password for the computer and stated RAMIREZ saved documents relating to RAMIREZ's PPE business (as I and agents believe, his fraudulent PPE "business"), such as invoices, on the **Target Computer**. In addition, as noted above, Counihan has stated to agents that RAMIREZ recently has begun running a new company, "Sunwest", purportedly employing several people including one of her family members. Counihan also told agents that none of these supposed "employees" have been paid so far.

20.     During the course of his fraudulent scheme, RAMIREZ communicated with investors by electronic mail and sent investors documents that were generated on a computer. Indeed, as to email, on May 25, 2022, the Honorable Andrew G. Schopler, United States Magistrate Judge, authorized a search warrant for the Google-hosted email account RAMIREZ frequently used to communicate with investors, rich@jmjcapitalgroup.com, for the time period of July 1, 2018, up to and including the date of execution of that warrant. The return became available from Google in late August 2022, and review remains ongoing. In addition, RAMIREZ sent investors purported "Funding Agreements" and "account statements" on numerous occasions. Investors have provided the FBI with documents including these from RAMIREZ, and based on the FBI's investigation, these investors received funding agreements and account statements via email from RAMIREZ. From my analysis of these documents, knowledge of the investigation, and training and experience, I believe these documents and others were generated on a computer, and I believe RAMIREZ sent them from a computer he was using during the course of his

6

fraudulent scheme. Based on the FBI's review and analysis of JMJ and RAMIREZ's bank records, I also believe RAMIREZ conducted financial transactions with a computer and online banking.

21.    Accordingly, and based on my knowledge of the investigation and my training and experience, I believe RAMIREZ used the **Target Computer** in connection with his fraudulent scheme, and there is probable cause to search it for evidence as set forth in Attachment B-1 for the time period of **July 1, 2018, up to and including September 30, 2022**.

## C.    Target Phone 1

22.    RAMIREZ had two phones in his possession at the time of his arrest. One, **Target Phone 1**, was on his person when he was arrested. The other, **Target Phone 2**, was found in the rental car, a Hyundai Elantra with Oklahoma plate LHA-153, he was driving (to LRS) at the time of his arrest. During his post-*Miranda* interview, RAMIREZ claimed these two phones as his, stating that one of them—**Target Phone 1**—was his business phone, and the other—**Target Phone 2**—was his personal phone. He consented to a review of WhatsApp correspondence on **Target Phone 1**, and interviewing agents reviewed some of the correspondence he claimed related to this new $13 billion PPE investment opportunity. Based on agents' review of these messages, and my knowledge of the investigation and RAMIREZ's fraud, and my training and experience, I believe that RAMIREZ's claims about this new PPE transaction and business opportunity were false.

23.    On September 8, 2022, the Honorable Allison H. Goddard authorized a pen register and trap and trace device (PRTT) on a WhatsApp account associated with RAMIREZ and a telephone number ending in -2048.[1] Analysis of the PRTT data for RAMIREZ's WhatsApp

---

[1] RAMIREZ had used this -2048 number in connection with his fraudulent scheme and to communicate with a number of investors via calls and text. One investor provided the FBI with screenshots of a text conversation he had with RAMIREZ on this number related to requests to pay back his investments. Further, in March 2022, a process server hired by different investors attempted to serve notice on RAMIREZ for a civil lawsuit relating to investments with RAMIREZ, and the process server corresponded with RAMIREZ on the -2048 number. The process server also provided the FBI with screenshots of a text conversation he had with RAMIREZ using this number at that time. AT&T records obtained by the FBI showed that the -2048 number was subscribed to JMJ at 7325 Corte Tomillo, Carlsbad, CA 92009. Around April 2022, RAMIREZ appears to have ceased using the -2048 number, at least for calls and texts, and AT&T records reflect that he no longer is the subscriber of this number. Further investigation did not yet reveal RAMIREZ's new number associated with a cellular phone and his calls and texts therefrom. However, additional investigation demonstrated that RAMIREZ was the user of at least  WhatsApp account associated with this -2048 number. On July 27, 2022, FBI

7

account has shown frequent activity and ongoing communication with at least individual the FBI had confirmed was a JMJ investor. This individual invested approximately $301,000 in JMJ, through RAMIREZ, between December 2020 and January 2021, and he received back approximately $243,353 from RAMIREZ (apparently under broker or employment agreements with JMJ) between approximately March and August 2021, plus an additional $3,500 Zelle payment from RAMIREZ in September 2021. Based on agents' analysis for the PRTT data, RAMIREZ's post-arrest statement, agents' review of his WhatsApp correspondence, my knowledge of the investigation, and my training and experience, I believe RAMIREZ was using **Target Phone 1** and the WhatsApp account associated with it to further his fraudulent activities.

24.     Accordingly, and based on my knowledge of the investigation and my training and experience, I believe RAMIREZ used **Target Phone 1** in connection with his fraudulent scheme, and there is probable cause to search it for evidence as set forth in Attachment B-2 for the time period of **July 1, 2018, up to and including September 30, 2022**.

**D.     Target Phone 2**

25.     As noted above, **Target Phone 2** was found in the rental car RAMIREZ was driving (to LRS) at the time of his arrest. In his post-*Miranda* interview with agents, RAMIREZ claimed this device was his personal phone.

26.     I believe RAMIREZ used this phone, too, in connection with his fraudulent investment scheme and that it contains evidence of his crimes. Based on my knowledge of the investigation and his fraud, and my training and experience, I do not believe RAMIREZ's statement that this phone was only his "personal" phone. He was dishonest with investors over several years, and he was dishonest with agents even in his post-*Miranda* interview. For instance, as noted above, his claim that he was about to close a $13 billion PPE deal lacks any support.

_____

agents interviewed Allison Spillane, who was employed as RAMIREZ's assistant at JMJ between approximately late 2020 until late 2021. She discussed her work with RAMIREZ at JMJ stated, in summary, that she understood she was employed to facilitate PPE transactions and investments and, although she had some suspicions, she left employment at JMJ in late 2021 and was not aware of RAMIREZ's scheme until early 2022. Spillane also stated she was aware of a WhatsApp account RAMIREZ has used and showed agents, on her phone, the profile associated with that account. RAMIREZ's account appeared to be active and associated with RAMIREZ and the -2048 number, and agents thus obtained and have been receiving PRTT data for this account.

RAMIREZ directed agents to WhatsApp correspondence that purported to show this transaction and its purported value, but agents' review of this correspondence, with RAMIREZ's consent, shows that his claim was false. I believe there was no such PPE deal and that any discussion of it was only a further attempt by RAMIREZ to defraud prospective or actual investors. Further, in speaking with agents after his arrest, RAMIREZ misrepresented the amounts of money investors gave him and he owed them. He claimed he obtained only approximately $600,000 from investors and owed them approximately $1 million. As described above, based on the FBI's analysis of bank records and interviews of investors, RAMIREZ received at least approximately $8 million from investors and caused a loss of at least $5 million. Finally, RAMIREZ's misrepresentations were pervasive, and his investors have included family members and other individuals close to him. For instance, an account of Counihan was used for check-kiting, as noted above regarding his purchase of the Escalade; RAMIREZ used investors' funds to pay his wife or ex-wife, Monique Ramirez; and, as Counihan stated to agents, RAMIREZ had purchased an engagement ring for her—with approximately $80,000 of investors' money, based on the FBI's review of bank records and investor interviews—and at some point he asked for it back from Counihan, telling her he would have it re-seized, but in reality, he simply sold the ring. Thus, even assuming RAMIREZ used **Target Phone 2** for "personal" purposes, I believe he used it for purposes relating to his fraud, money laundering, and potentially other offenses.

27. Accordingly, based on the facts set forth above, my knowledge of the investigation and my training and experience, I believe RAMIREZ used **Target Phone 2** in connection with his fraudulent scheme, and there is probable cause to search it for evidence as set forth in Attachment B-3 for the time period of **July 1, 2018, up to and including September 30, 2022**.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

### A. Target Computer

28. With the approval of the Court in signing the warrant to search the **Target Computer**, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant.

**Forensic Imaging**

29.    A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. It can take several hours to image a single hard drive—the bigger the drive, the longer it takes.

30.    Agents intend to access the **Target Computer** and obtain a forensic image by using, among other potential means, the password that Counihan provided to agents, as noted above.

**Identification and Extraction of Relevant Data**

31.    After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software.There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

32.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record—e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover

relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

33.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

34.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

35.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 120 days of this warrant, absent further application to this court.

36.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**B.      Target Phones**

37.     It is not possible to determine, merely by knowing the cellular telephone=s make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number

of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

38.     Following the issuance of this warrant, agents will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

39.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## GENUINE RISKS OF DESTRUCTION

40.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, I do not believe there is any genuine risk of destruction of evidence, because the FBI already has seized and has possession of the **Target Computer** and **Target Phones**.

**1**      **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

**2**      41.    As noted above, the government seized the **Target Computer** pursuant to a search

**3** warrant, and RAMIREZ consented to a partial search (review of his WhatsApp messages) in his

**4** post-*Miranda* interview. The government has not otherwise attempted to obtain evidence from

**5** the **Target Computer** and **Target Phones** by other means.

**6**      **CONCLUSION**

**7**      42.    Based on the foregoing, there is probable cause to believe that the **Target**

**8** **Computer** and **Target Phones** have been used in the commission of crimes, and contains or

**9** constitutes evidence, fruits, and instrumentalities of violations of Title 15, United States Code,

**10** Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18,

**11** United States Code, Sections 1341, 1343, 1956, and 1957. I request a warrant to search the **Target**

**12** **Computer** and **Target Phones**, as described and set forth in Attachment A-1, A-2, and A-3, and

**13** to seize the evidence of crimes, as described and set forth in Attachments B-1, B-2, and B-3.

**14**

**15**      Alexander E. Murray
                Alexander E. Murray
**16**          Special Agent
                Federal Bureau of Investigation

**17** Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by

**18** telephone, on October 14, 2022.

**19**

**20**      Barbara L Major
                Honorable Barbara L. Major
**21**          United States Magistrate Judge

**22**

**23**

**24**

**25**

**26**

**27**

**28**